IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 2, 2006

**STATE OF TENNESSEE v. LARRY J. NOEL**

**Direct Appeal from the Circuit Court for Lauderdale County**
**No. 7646  Joseph H. Walker, III, Judge**

_____

**No. W2005-01958-CCA-R3-CD  - Filed August 4, 2006**

_____

The defendant, Larry J. Noel, was convicted by a Lauderdale County jury of attempted first-degree murder, aggravated assault, retaliation for past action, unlawful possession of a weapon, and driving on a revoked license. On appeal, he argues that the evidence was insufficient to convict him of attempted first-degree murder. After our review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J.C. McLin, J., delivered the opinion of the court, in which Thomas T. Woodall and John Everett Williams, JJ., joined.

Gary F. Antrican, District Public Defender (at trial and on appeal) and Julie Pillow, Assistant Public Defender (at trial) for the appellant, Larry J. Noel.

Paul G. Summers, Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; and Tracey A. Brewer-Walker and James Walter Freeland, Jr., Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**BACKGROUND**

The defendant was charged with attempted first-degree murder, aggravated assault, retaliation for past action, unlawful possession of a weapon, and driving on a revoked license, second offense, arising out of the shooting of Norma Noel in Lauderdale County, Tennessee, on April 13, 2004. The defendant was brought to trial on the charges. At the trial, Suzanne Shelton with the Department of Safety testified that the defendant's driving status on April 13, 2004, was "revoked."

Keith Chaney testified that he was a long-time friend of the defendant. Chaney recalled that on April 12, 2004, he was getting his brakes fixed at the defendant's auto-body shop. Chaney

testified that the defendant talked about his marital problems and said that he and Mrs. Noel were in the process of getting a divorce. The defendant told Chaney that Mrs. Noel had a restraining order against him and they were scheduled to be in court the next day. According to Chaney, the defendant told him "if things didn't go in his favor that he was going to do something to her," and that "she'd be dead before lunchtime."

Chaney testified that the defendant owned several handguns, including a black government-issued Colt .45 caliber handgun. Chaney knew the defendant owned that particular gun because they had gone shooting before, and at some point the defendant tried to sell the gun to him. Chaney testified that although the defendant was presently confined to a wheelchair, he was not on April 12, 2004.

On cross-examination, Chaney testified that he and the defendant had gone target shooting once or twice. He clarified, however, he saw the defendant with the Colt .45 at his auto-body shop, not while target shooting. Chaney could not recall the exact day he saw the defendant with the Colt .45, but he estimated that it was the day before or after Mrs. Noel was shot.

Chaney testified that no one else was present on the day the defendant made the statement about killing Mrs. Noel. Chaney recalled having a conversation with the defendant, Rufus Baldwin, and Wayne Cotton, Mrs. Noel's nephew, some time prior to April 12th. However, Chaney denied saying that, "[Mrs. Noel's] whole family needs to be shot," during that conversation.

Marshall Ricks testified that he used to work for the defendant at the auto-body shop. Ricks said he and the defendant drove to court on April 13, 2004, in a small gray car. About ten or fifteen minutes after they arrived, Ricks noticed that Mrs. Noel was also in the courtroom. Ricks said that he had known Mrs. Noel for several years.

Ricks recalled that the judge ordered the defendant and Mrs. Noel to stay away from each other. Upon hearing the judge's order, the defendant appeared normal and not upset. Ricks said that he and the defendant left the courtroom and went back to the auto-body shop. After staying at the shop for a few minutes, Ricks started up a beige Riviera because the small gray car had been running hot. Ricks said that he believed the Riviera belonged to the defendant. While Ricks was starting the Riviera, he could not see what the defendant was doing.

Ricks testified that the defendant suggested the two go out for lunch, and they departed in the Riviera with the defendant driving. Ricks recalled they drove toward City Hall and turned toward the Cowboy Cleaners at which time he saw Mrs. Noel turning left by the Cowboy Cleaners going toward the electric company. Ricks testified that he could not be sure the defendant saw Mrs. Noel, but the defendant began driving at a strange speed toward the gas and water department. Ricks explained that a "strange speed" was a speed over the thirty-mile-per-hour speed limit.

Ricks testified that the defendant stopped at a three-way stop and let several cars go ahead of him. When he asked the defendant why he was not driving on, the defendant gave no response.

Then Ricks observed Mrs. Noel's vehicle enter the intersection. Ricks recalled that as Mrs. Noel was entering the intersection, the defendant pulled out and cut her off.

Ricks testified that when he realized the defendant was blocking Mrs. Noel's car, he exclaimed, "Look, don't start nothing. We just left court. Leave that woman alone. That's what the judge said." According to Ricks, the defendant "didn't seem at his self." Ricks remembered that the defendant yelled to Mrs. Noel, "Baby, I love you. Why you do me like this?"

Ricks testified that neither the defendant nor Mrs. Noel got out of their cars. However, the defendant was approximately five feet from Mrs. Noel during the encounter with his window down. Ricks recalled that he glanced away and when he looked back at the defendant, the defendant had pulled a pistol out from his pants. Ricks testified that he yelled to Mrs. Noel to get down right before the defendant fired a shot.

Ricks stated that the defendant fired two shots in Mrs. Noel's direction, but the second shot was fired as they pulled off. Ricks testified that the defendant had driven about two feet when Ricks jumped out of the car and went to check on Mrs. Noel. According to Ricks, the defendant pulled away, going toward town.

Ricks recalled that he checked on Mrs. Noel and she told him she was hit and could not move her legs. He ran to a nearby flower shop and called 911. He returned to the scene after making the call and Mrs. Noel gave him some money to give to her son. Later, Ricks saw the defendant being booked by Corporal Rhonda Mack and Corporal Paige at the jail. According to Ricks, in both officers' presence, the defendant said that "he didn't shoot his wife, the judge did."

Ricks testified that after they left the courtroom the morning of the 13th, the defendant said he had a gun and "could have killed them in court," but he never saw the gun. Ricks further testified that the defendant's statement of having a gun in court might have been heard by Lieutenant Sanders and the bailiff.

On cross-examination, Ricks testified that the defendant "made a statement that [Mrs. Noel] did not have to lie about them getting back together." On redirect examination, Ricks testified that the Colt .45 was in a cabinet at the auto-body shop on April 12th, and the defendant asked him to get it for him as they were getting ready to leave for the day. Ricks stated that he had never seen the defendant with that gun before. On re-cross examination, Ricks testified that he was not positive whether it was April 12th or another day that he got the gun out of the cabinet for the defendant.

Tawanna Smith testified that in the morning hours of April 13th she was in her vehicle at a stop sign on Highland Street in Ripley, Tennessee. She testified that a two-door cream car that appeared to be a Cadillac was ahead of her at the stop sign. Smith noticed that the Cadillac seemed to be waiting at the stop sign and the driver did not go when it was his turn. Smith estimated that two other cars went through the intersection before the driver of the Cadillac pulled out in front of a four-door white Grand Am and then pulled beside the Grand Am. Smith saw the driver of the

-3-

Cadillac say something to the driver of the Grand Am, then pull out a gun and start shooting. Smith recalled hearing two gunshots. She remembered that the shooter moved before taking the second shot "like he was trying to get better aim or something."

Smith testified that she did not realize there was a passenger in the Cadillac until the passenger jumped out of the car after the gunshot. Smith recalled that the Cadillac continued to drive off after the passenger jumped out. Smith recognized Ricks as the passenger who bailed out of the moving car and ran toward the Grand Am.

Ripley Police Officer James Drake testified that around 11:30 a.m. on April 13th he responded to a shooting at the intersection of Main and Highland streets. Later that day, Officer Drake transported the defendant from a holding cell at the police department to the justice complex. Officer Drake said that he did not interrogate or question the defendant, but the defendant "did a lot of talking." Officer Drake recalled that the defendant said, "people didn't understand him, the law didn't understand him, [the judge] didn't understand him, nobody understood what he was going through." According to Officer Drake, the defendant never expressed concern for Mrs. Noel. Particularly, the defendant commented, "Well, . . . I don't care . . . I'm not concerned about Norma. I wouldn't have shot her if I did." On cross-examination, Officer Drake denied having previously said that he and the defendant did not talk during the trip. Officer Drake clarified that he had said he did not talk but the defendant did.

Corporal Rhonda Mack with the Lauderdale County Sheriff's Office testified that she was the booking officer the day the defendant was brought in. Corporal Mack recalled the defendant talked about Mrs. Noel and complained about what went on between them. Corporal Mack further recalled that she told the defendant that he needed to be worried about Mrs. Noel, and the defendant responded that he was not worried about her and if he wanted her dead, she would be dead. Corporal Mack testified that the defendant told her that he had shot Mrs. Noel, and she believed he said he had used a .44 caliber handgun. Corporal Mack remembered at some point the defendant said "that he had come through the metal detector and that the detector went off and the officer that was working it, it beeped, and he stopped him. He said, 'Oh, that's my belt buckle. I had the gun back here.'"

On cross-examination, Corporal Mack admitted that the defendant was the brother-in-law of one of her friends. She testified that during booking, the defendant told her that Mrs. Noel had come to his room the night before and told him that she was going to be okay. On redirect examination, Corporal Mack testified that Corporal Paige was another supervisor on the shift with her and was present intermittently during the defendant's booking.

Corporal Paige with the Lauderdale County Justice Center testified that he, Corporal Mack, and Ricks were present during the defendant's booking. Corporal Paige explained that Ricks was there to pick up his house keys from the defendant. Corporal Paige testified that he heard the defendant say that " he went in [the courtroom], [and] the detector went off. And he said he told [the bailiff] that it was his belt buckle. And he said that he could have killed his wife when he went in." Corporal Paige testified that the defendant never actually admitted that he shot Mrs. Noel. Corporal

Paige recalled that at some point the defendant said "[t]he judge did it. . . . [i]t was her fault," referring to the restraining order.

Mrs. Noel testified that she was still legally married to the defendant. She stated that at the time the defendant shot her, she had filed for divorce and they had not lived together for about a month. Mrs. Noel recalled she sought a restraining order against the defendant on April 6, 2004, and that was why they were in court on April 13th. Mrs. Noel said that she testified at the hearing on the restraining order and toward the close of the proceedings the defendant told the judge, "I know a lot of reasons why we should try to salvage this marriage." Mrs. Noel remembered that Ricks was present at the hearing.

Mrs. Noel recollected that after she left the hearing, she went to the bank and proceeded home. Mrs. Noel recalled that she was driving on Main Street toward the intersection with Highland Street. When she prepared to make a left turn onto Highland Street, the defendant's car "came across in front of me at a high rate of speed, and he kind of blocked me in. And he pulled . . . up a gun . . . . And then when I went to lay down, I saw him pull . . . around just right beside my car, like car to car." Mrs. Noel noticed that Ricks was in the car with the defendant.

Mrs. Noel testified that she did not think the defendant said anything to her when he pulled next to her. Mrs. Noel testified that the only thing she recalled was seeing the defendant "pull the gun up, and then . . . pull[] around beside [her]. And then as [she] was laying down, [she] heard two shots fired." She testified that one of the bullets hit her in her left side and she was immediately paralyzed. Mrs. Noel said that she was in the hospital for a little over a month and the doctors were unable to remove the bullet. Mrs. Noel lastly read from the order of protection where the judge mandated the defendant to refrain from abusing or threatening to abuse her and her children effective April 13, 2004 to April 13, 2005.

On cross-examination, Mrs. Noel admitted that her and the defendant had a history of living together and then being separated, and she had a previous order of protection against him. Mrs. Noel further admitted that during that previous protection order, she and the defendant had contact with each other toward the expiration of the order. Regarding the April 6, 2004, order of protection, Mrs. Noel testified that the defendant called her during the week between her filing and the hearing. Mrs. Noel denied having called the defendant on the night of April 12th.

Mrs. Noel denied having made a comment that she did not think the defendant meant to kill her. Mrs. Noel reiterated that although she did not see the defendant actually fire the gun because she was lying down, she did see the gun in the defendant's hand and heard Ricks yell, "[d]on't shoot that girl." On redirect examination, Mrs. Noel testified that Ricks got out of the defendant's car and came to her car, at which point she told him to put her car in park and to give the money that she handed him to her family.

Lieutenant Steve Sanders of the Ripley Police Department testified that on April 13, 2004, he was leaving the police station when the defendant pulled up in his car with a handgun in his hand.

Lieutenant Sanders recalled that the defendant handed him the gun and said you are going to need this "I just shot and killed Norma up the street." Lieutenant Sanders testified that the defendant further said, "he was tired of Norma and the judge F-ing over him." Lieutenant Sanders explained that he told the defendant to park his car, go inside the station, and wait for him. Lieutenant Sanders testified that he drove on Main Street until he reached the intersection where he saw a white Pontiac Grand Am with two gunshots-one to the rear glass, one to the front driver's side glass.

Lieutenant Sanders recalled that he had seen the defendant and Ricks at the courthouse earlier the day of the 13th. Lieutenant Sanders stated that the defendant told him that Mrs. Noel had obtained an order of protection against the defendant, but he was hoping they could work things out. Lieutenant Sanders did not see the defendant with a gun.

The defendant presented the following proof on his behalf. Kenneth Stowe, the defendant's brother, testified that the defendant and Mrs. Noel "had separated and got back together and separated and got back together" over the years. Marcy Rhea testified that the defendant used to lease an apartment from her father and she talked to him on occasion. She testified that she was aware of an order of protection against the defendant with regard to Mrs. Noel during the time he leased the apartment. Rhea testified that she saw the defendant and Mrs. Noel together during the time the protection order was in effect and that Mrs. Noel would sometimes stay at his apartment. She stated that she was subpoenaed to be in court on April 13, 2004, and she called the last number she had for the defendant the night before to find out why, and Mrs. Noel answered and they talked for twenty to thirty minutes. Rhea said that the next day she saw the defendant in the courtroom, and he confronted her about the substance of her conversation with Mrs. Noel, which indicated to her that the defendant and Mrs. Noel had spoken to each other.

Dr. Pamela Auble, an expert in psychology, testified that the defendant had been diagnosed with post-traumatic stress disorder, panic attacks, and major depression in the past. She explained that the defendant was the last person over the Hatchie River bridge before it collapsed in April 1989, and he experienced a period of amnesia after the event. Dr. Auble testified that she performed several tests on the defendant, which led her to conclude that:

> on the day of the shooting . . . he was depressed and upset and frustrated; that when he is angry and stressed, it was consistent with his history that he would act or could act in explosive ways given a sufficient level of stress. And it's also consistent with his history that he wouldn't remember exactly what happened at the time that it did. So it's my opinion that his mental diseases of posttraumatic stress disorder, depression, and I also thought he had a paranoid personality disorder, that those things in combination, that he wasn't able to engage in reflection and judgment, but was in the grip of strong emotions when this happened.

On cross-examination, Dr. Auble admitted that the defendant told her that the day before the shooting he had found telephone numbers on his wife's cell phone, presumably of men, as well as hotel receipts and it made him suspicious of his wife. Dr. Auble stated that she was not aware that

Mrs. Noel had a restraining order against the defendant for several days prior to the shooting. In addressing her opinion regarding premeditation, Dr. Auble maintained that the defendant told her that he did not tell Chaney that Mrs. Noel would be dead if things did not go well at the hearing. Dr. Auble also maintained she was not aware that Smith would testify at trial that the defendant let a number of vehicles go through the three-way stop awaiting Mrs. Noel's arrival at the intersection. Dr. Auble testified that even if she had known the defendant sat armed at the three-way stop awaiting his wife's arrival, her opinion as to premeditation would not have necessarily changed.

Dr. Auble testified that the defendant still claimed he loved Mrs. Noel and was concerned about her. However, Dr. Auble admitted that the defendant's concerns were from his perspective such as "he can't function without his wife," and she did not recall his being concerned that Mrs. Noel was confined to a wheelchair. Dr. Auble also admitted that the defendant had filed multiple grievances regarding his own medical treatment. Dr. Auble stated that in the past twenty years she had been an expert for the state once or twice.

On redirect examination, Dr. Auble testified that the fact the defendant shot Mrs. Noel in public indicated that he was feeling strong emotions and did not have the plan arranged in his mind beforehand. On re-cross examination, Dr. Auble admitted that an act can be premeditated although stupid and not well planned.

The defense made an offer of proof regarding what Stowe's testimony would have been regarding a conversation he had with Mrs. Noel after the shooting. According to Stowe, Mrs. Noel said that she did not think the defendant was trying to kill her.

The jury convicted the defendant of attempted first-degree murder, aggravated assault, retaliation for past action, unlawful possession of a weapon, and driving on a revoked license. Following a sentencing hearing, he was sentenced to an effective sentence of twenty-three years and received a fifty dollar fine.

**ANALYSIS**

The defendant challenges the sufficiency of the evidence convicting him of attempted first-degree murder. Specifically, he argues that he did not possess the ability to engage in the reflection and judgment necessary to establish premeditation.

Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In

contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558; *Tuggle*, 639 S.W.2d at 914. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *Id.*

A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). To be premeditated, the intent to kill must have been formed before the act itself, and the accused must be sufficiently free from excitement and passion. *Id.* An intentional act requires that the person have the desire to engage in the conduct. *See id.* § 39-11-106(a)(18). Whether premeditation is present is a question of fact for the jury, and it may be determined from the circumstances surrounding the offense. *Bland*, 958 S.W.2d at 660; *State v. Anderson*, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992). In particular, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, and the use of a deadly weapon upon an unarmed victim are evidence of premeditation. *See Bland*, 958 S.W.2d at 660. A person commits criminal attempt who, "acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part . . . ." Tenn. Code Ann. § 39-12-101(a)(2).

After considering the evidence, we conclude that a rational jury could have found the defendant guilty of attempted first-degree murder. To sustain the defendant's conviction, the state was required to prove that the defendant, after the exercise of reflection and judgment, attempted to kill Norma Noel. In the light most favorable to the state, the evidence at trial established that the defendant told Keith Chaney the day before the shooting that Mrs. Noel would be dead before lunchtime if things did not go in his favor. The night before the protection hearing, the defendant had Marshall Ricks bring him his gun from a cabinet at the auto-body shop. As he exited the courtroom following the hearing, the defendant claimed he had a gun and could have killed Mrs. Noel in the courtroom. The defendant then shot Mrs. Noel after trapping her car at an intersection. Afterward, the defendant expressed no concern about having shot Mrs. Noel.

Additionally, testimony regarding the defendant's state of mind was assessed by the jury. By its verdict, the jury determined that the defendant possessed the ability to engage in the reflection and judgment necessary to establish premeditation. Accordingly, we conclude the evidence supports all the necessary elements for the defendant's attempted first-degree murder conviction; thus, we affirm the judgment of the trial court.

## CONCLUSION

Following our review of the record and the parties' briefs, we affirm the judgment of the trial court.

_____
J.C. McLIN, JUDGE